CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

July 18, 2024
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **KEITH E. CRABTREE,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:23cv00023 |
| | ) | **REPORT AND** |
| **MARTIN J. O'MALLEY,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By:  PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Keith E. Crabtree, ("Crabtree"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision.  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023.  Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case.  Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Crabtree protectively filed his application for DIB on September 23, 2020, alleging disability as of July 12, 2020, based on back problems and pain; no feeling in the left leg; not sleeping due to pain; high blood pressure; an enlarged prostate; anxiety; and depression. (Record, ("R."), at 13, 236, 238-39, 267, 293, 317.) The claim was denied initially and upon reconsideration. (R. at 98-109.) Crabtree then requested a hearing before an administrative law judge, ("ALJ"). (R. at 110-11.) The ALJ held a hearing on November 12, 2021, at which Crabtree was represented by counsel. (R. at 919-42.)  Thereafter, the ALJ held a supplemental hearing on May 11, 2022, at which Crabtree, again, was represented by counsel.  (R. at 42-62.)

By decision dated June 28, 2022, the ALJ denied Crabtree's claim. (R. at 13-26.) The ALJ found that Crabtree meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2025.[2] (R. at 16.) The ALJ found that Crabtree had not engaged in substantial gainful activity since July 12, 2020, the alleged onset date. (R. at 16.) The ALJ determined that Crabtree had a severe impairment, namely degenerative disc disease, but she found that he did not have an

---

[2] Therefore, Crabtree must show that he was disabled between July 12, 2020, the alleged onset date, and June 28, 2022, the date of the decision, to be eligible for benefits.

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ found that Crabtree had the residual functional capacity to perform sedentary[3] work, except he should never climb ladders, ropes or scaffolds, never crouch and never perform fine balancing; he could occasionally stoop, kneel, crawl and climb ramps and stairs; he could not use foot pedals with the left lower extremity; and he could have no exposure to industrial vibration, hazards or unprotected heights.  (R. at 17-18.)  The ALJ found Crabtree was unable to perform his past relevant work as a police officer and as a resource officer/police officer II. (R. at 23-24.)  Based on Crabtree's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Crabtree could perform, including those of an information clerk, a dispatcher and a service dispatcher/clerk.  (R. at 24-25.)  Thus, the ALJ concluded that Crabtree was not under a disability as defined by the Act from July 12, 2020, through the date of the decision, and he was not eligible for DIB benefits. (R. at 25-26.) *See* 20 C.F.R. § 404.1520(g) (2023).

After the ALJ issued her decision, Crabtree pursued his administrative appeals, (R. at 233-34, 346-47), and the Appeals Council granted his request for review, by letter dated March 20, 2023.  (R. at 228-32.)  Specifically, the Appeals Council found that the ALJ made inconsistent findings in her decision, in that she found at step five of the sequential evaluation process, that Crabtree did not have

---

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met.  *See* 20 C.F.R. § 404.1567(a) (2023).

Case 2:23-cv-00023-JPJ-PMS    Document 16    Filed 07/18/24    Page 4 of 37
Pageid#: 996

transferable skills, while also finding at step five that Crabtree could perform the following semi-skilled jobs that existed in significant numbers in the national economy: information clerk, dispatcher and service dispatcher. (R. at 229.) The Appeals Council further stated that the ALJ's finding that Crabtree did not have transferable skills was inconsistent with the vocational expert's testimony, which included that Crabtree had transferable skills of communication, recording and keyboarding – skills that would be transferable to other sedentary jobs. (R. at 229.) Additionally, the vocational expert cited the semi-skilled jobs of information clerk, dispatcher and service dispatcher. (R. at 229.) Based on the vocational expert's testimony, the Appeals Council found that the ALJ's apparent inconsistent findings were a typographical error in the decision. (R. at 229.) Therefore, the Appeals Council proposed to find that Crabtree had transferable skills. (R. at 229.) On April 13, 2023, Crabtree's counsel wrote to the Appeals Council, requesting review, stating he disagreed with the Appeals Council's action because the vocational expert's testimony that Crabtree had transferable skills of recording and keyboarding was "completely erroneous and without fact or truth." (R. at 348-49.) He stated that Crabtree's job in law enforcement resulted in no specialized communication skills that would specifically transfer to any sedentary work activity, that no such evidence was introduced, and the Dictionary of Occupational Titles, ("D.O.T."), does not provide that any recording or keyboarding skills are requisite to a deputy sheriff's duties that would qualify one to be an information clerk, a dispatcher or a service dispatcher, all of which require skilled or semi-skilled clerical skills, totally unlike the skills necessary to perform deputy sheriff duties. (R. at 348-49.) On May 16, 2023, the Appeals Council adopted the ALJ's ultimate finding that Crabtree was not under a disability from July 12, 2020, through June 28, 2022, but corrected the step five finding that Crabtree had the transferable job skills of communication, recording and keyboarding. (R. at 1-8.)

Crabtree then filed this action seeking review of the ALJ's unfavorable decision, as modified by the Appeals Council, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2023). This case is before this court on Crabtree's motion for summary judgment filed September 26, 2023, and the Commissioner's brief filed January 2, 2024.

## II. Facts[4]

Crabtree was born in 1973, (R. at 238), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has some college education and past work experience as a patrol officer and a police officer II. (R. at 268, 937.) At the November 12, 2021, telephonic hearing, Crabtree testified he lived with his two teenaged sons. (R. at 924.) He said he drove "maybe twice a week," but for only 10 to 15 minutes at most. (R. at 925, 930.) Crabtree also stated his back caused difficulty driving, noting he could not turn around to look behind him. (R. at 930.) Although he used to cook quite a bit, he stated his boys did most of the cooking, making mostly convenience foods, and they did all the housework. (R. at 925, 932.) He stated that, over the previous 23 years, he worked as a police officer, initially as a patrol officer and, for the last seven years, as a lieutenant in a sheriff's office where he was placed into the school resource officer program. (R. at 925.) Crabtree testified that, after his most recent spinal surgery, he developed a drop foot. (R. at 926.) Crabtree testified he used a cane for about six months for balance, but his neurosurgeon told him to "do away with [it.]" (R. at 927.) He said he still took the cane with him if he went to the store because he stumbled a lot due to his drop foot,

---

[4] Because Crabtree's arguments on appeal focus on his physical impairments, the undersigned has limited the discussion of facts to those pertinent thereto.

and he had fallen on "several occasions." (R. at 927.) Crabtree testified he could not sit, stand, walk or lie down for long periods. (R. at 928.) He stated walking a considerable distance caused extreme lower back pain, and over the prior several months, he had begun to have extreme swelling in the left leg and left foot that hindered his mobility. (R. at 928.) Crabtree testified he took a diuretic for swelling, and his physician had advised him to elevate his leg above waist level. (R. at 928, 930.) He estimated he could sit approximately 15 to 20 minutes before having aching in the lower back; walk, unassisted, for 10 minutes; and lie down for 45 minutes to one hour. (R. at 929.) He stated he tossed and turned in bed, having to shift sides to alleviate his pain, resulting in feeling tired and run down during the day and requiring him to nap daily for 30 minutes to an hour. (R. at 929, 931.) Crabtree testified he could not use lace-up shoes because he could not reach his left foot, and it was very difficult to get socks and shoes on that foot, as it was very painful to lean over and to pull his shoes up. (R. at 932.) He stated he had to shower quickly because he could not stand for long. (R. at 932.) Crabtree stated he took over-the-counter Motrin and Advil and prescription-strength ibuprofen for his pain, and he had used a heating pad numerous times. (R. at 933.) He also said he purchased a hot tub to help ease his back pain and hip pain that had developed over the prior several months as a result of limping. (R. at 933, 935.) Crabtree testified he had more bad days than good days, which he described as lying in bed most of the day. (R. at 933-35.) Crabtree stated he cared for his two-pound dog by letting her out of the house and feeding and giving her water. (R. at 935.) However, he stated he did not have to manage heavy dog food bags or bend over to do these things. (R. at 935.)

Tanja Hubacker, a vocational expert, also testified at Crabtree's November 2021 hearing. (R. at 936-41.) She classified his past work as a patrol officer as very

heavy[5] and skilled; and as a police officer II as light[6] and skilled, but as performed, as medium[7] to very heavy. (R. at 937.) Hubacker testified Crabtree would have learned skills that would transfer to the sedentary level of exertion, namely communication skills, recording and reporting and basic computer and keyboarding skills. (R. at 937.) She said a hypothetical individual of Crabtree's age, education and past work experience, who could perform light work, but who would need to alternate sitting, standing and walking every 30 minutes throughout the day; who could not climb ladders, ropes or scaffolds; who could not perform fine balancing; who could occasionally perform other postural movements; who could not operate foot pedals with the left lower extremity; and who could not work in an environment with industrial vibration or around heights or hazards, could not perform any of Crabtree's past relevant work. (R. at 937-38.) Hubacker testified that such an individual could perform sedentary jobs existing in significant numbers in the national economy, including those of an information clerk, a dispatcher and a service dispatcher/service clerk. (R. at 939.) The record was held open, pending a consultative orthopedic examination. (R. at 941-42.)

---

[5] Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can perform very heavy work, he also can perform heavy, medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(e) (2023).

[6] Light work involves lifting up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities. If someone can perform light work, he also can perform sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. *See* 20 C.F.R. § 404.1567(b) (2023).

[7] Medium work involves lifting up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2023).

At a supplemental hearing on May 11, 2022, Crabtree testified that, since his prior hearing, Dr. Nida had discontinued ibuprofen and prescribed a stronger pain medication – Celebrex, and he had discussed the possibility of attending a pain management clinic.  (R. at 46-47.)  Crabtree stated he had begun experiencing pain in his mid-back, and he was having burning and pulling in his neck and shoulder that had increased over the previous few months.  (R. at 47-48.)  Crabtree testified he had difficulty gripping and grasping objects, noting he would drop his coffee cup and utensils, but he had not seen a medical provider for this.  (R. at 52.)  He said this began before his initial back surgery in September 2020, and would come and go.  (R. at 52.)  Counsel for Crabtree noted a July 10, 2020, cervical MRI, showing radiculopathy and cervical spinal stenosis.  (R. at 52.)

In rendering her decision, the ALJ reviewed records from Norton Community Hospital; Dr. Jack Hutcheson, Jr., M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Mountain View Hospital; Wellmont Urgent Care; Lonesome Pine Hospital; Dr. Maurice E. Nida, D.O.; Blue Ridge Neuroscience Center; Dr. Kenneth W. Smith, M.D.; Vickie Stevens, F.N.P.; Ballad Health Medical Associates Rehabilitation; and Wellmont Medical Associates.

By way of background, Crabtree underwent an L4-L5 laminectomy for a ruptured disc in 1993.  (R. at 352.)  A June 8, 2011, MRI of the lumbar spine showed a right L4-L5 disc herniation; a small central L3-L4 disc protrusion; and mild congenital spinal stenosis at the L3 level.  (R. at 352-54.)  A note dated September 11, 2019, from Dr. Maurice E. Nida, D.O., at Wellmont Medical Associates, summarizes Crabtree's history as follows:  He had an extensive history of back pain starting as a teenager.  (R. at 657.)  At 12 years old, Crabtree began having low back

pain, and as a senior in high school, the pain was so severe, he was in a wheelchair. (R. at 657.)  Thereafter, Crabtree had surgery on the L4-L5 area of his back, and he had a follow-up surgery in 2010.  (R. at 657.)  Crabtree stated he had flare-ups a few times a year, which were well-controlled with ibuprofen, and he stated he did not want further treatment at that time.  (R. at 657.)

On June 8, 2020, Crabtree presented to Wellmont Medical Associates with complaints of neck, left shoulder and left arm pain, with some pain radiating to the chest, after using a pressure washer less than a week previously.  (R. at 365.)  Wendy N. Rumley, F.N.P., a family nurse practitioner for Dr. Nida, diagnosed acute left shoulder pain, left arm pain and neck pain.  (R. at 368.)  An EKG showed no obvious abnormalities; x-rays of the left shoulder showed no acute osseous abnormality, but probable sequela of degenerative or post-traumatic changes of the glenohumeral joint; and x-rays of the cervical spine showed mild degenerative changes.  (R. at 368, 548-52.)  On June 16, 2020, Crabtree complained of chest pain and arm pain, and he reported being seen at urgent care a few days previously for neck and left shoulder pain.  (R. at 643.)  He reported that ibuprofen and steroids had not helped very much, and he requested some time off work due to lacking confidence in his ability to perform work duties.  (R. at 643.)  Crabtree's height was recorded at six feet, seven inches, with a weight of 281 pounds.  (R. at 644.)  On examination, he had normal neck range of motion; normal heart rate, regular rhythm, normal sounds and intact distal pulses; decreased range of motion, tenderness and decreased strength in the left shoulder; and decreased left hand strength.  (R. at 644-45.)  Dr. Nida diagnosed cervical radiculopathy; left arm pain; acute left shoulder pain; and neck pain, and he prescribed ibuprofen and ordered a cervical spine MRI.  (R. at 645-46.)  He also provided a work excuse through the end of the week.  (R. at 646.)  On July 1, 2020, Dr. Nida noted that a cervical spine x-ray showed mild degenerative changes, and a

left shoulder x-ray showed no acute osseous abnormality.  (R. at 637.)  Crabtree reported continued pain that interfered with his daily activity, including his ability to work.  (R. at 637.)  He noted two prior back surgeries with full recovery and that he expected to have another surgery.  (R. at 637.)  Crabtree endorsed arthralgias, back pain and neck pain.  (R. at 639.)  Physical examination findings were completely normal, including normal neck range of motion; and no musculoskeletal deformity or edema. (R. at 639-40.)  Dr. Nida diagnosed cervical degenerative disc disease; cervical radiculopathy; acute left shoulder pain; and left arm pain.  (R. at 640.)  He refilled Crabtree's ibuprofen and kept him off work through August 3, 2020, pending further evaluation.  (R. at 640, 642.)  A July 10, 2020, MRI of the cervical spine showed disc osteophyte complexes at multiple levels with moderate spinal stenosis at the C5-C6 level and moderate to severe spinal stenosis at the C6-C7 level; and multi-level neural foraminal stenosis.  (R. at 371.)  A neurological consult was recommended.  (R. at 371.)

Crabtree returned to Dr. Nida on August 3, 2020,[8] with complaints of back pain that radiated down the left hip and back of the leg, as well as leg numbness from the knee down.  (R. at 632.)  Dr. Nida noted Crabtree began having severe lower back pain with shooting pain down the right leg two weeks previously.  (R. at 632.) While alternating positions sometimes helped, 800 mg ibuprofen, rest and ice did not provide much relief.  (R. at 632.)  Dr. Nida also noted Crabtree had been having neck pain for three months, and an MRI showed cervical spinal stenosis with radiculopathy.  (R. at 545-47, 632.)  He endorsed arthralgias, back pain, gait problem, myalgias, neck pain and sleep disturbance.  (R. at 634.)  On examination, Crabtree had normal findings, except for muscle spasm in the lumbosacral paraspinal

---

[8] It appears that Dr. Nida had relocated from Wellmont Medical Associates to Ballad Health Medical Associates Family Medicine.  (R. at 632.)

region.  (R. at 634-35.)  Dr. Nida diagnosed displacement of a lumbar intervertebral disc, for which he administered a Toradol injection, he prescribed Flexeril, excused Crabtree from work for one month and referred him for a neurosurgical evaluation. (R. at 635.)

Crabtree saw Bethany N. Millsaps, N.P., a nurse practitioner at Blue Ridge Neuroscience Center, for this neurosurgical consultation on August 5, 2020.  (R. at 852.)  Millsaps noted Crabtree's history of low back pain, left leg weakness and left leg pain.  (R. at 852.)  Crabtree's chief complaints were back and left leg pain and left foot drop.  (R. at 852.)  He stated he had experienced chronic low back pain since a prior lumbar surgery in 2011, but it usually flared up "this bad" for one to two weeks at a time before going away, and it had never been accompanied by foot weakness.  (R. at 852.)  Crabtree also reported the onset of neck and left arm pain around the end of June 2020 when he stood up and stretched.  (R. at 852.)  Although the neck pain persisted, the arm pain resolved around the end of July.  (R. at 852.) However, Crabtree stated he felt his left arm was weaker than the right arm, and he frequently dropped things.  (R. at 852.)  He described his neck as feeling "heavy." (R. at 852.)  Crabtree denied loss of balance when walking or loss of hand dexterity. (R. at 852.)  He reported using muscle relaxers, NSAIDS and steroid injections.[9]  (R. at 852.)  Millsaps noted Crabtree had undergone prior lumbar surgeries in 1993 and 2011.  (R. at 852.)  On examination, he had a slow and limping gait, but he was able to stand without difficulty; the lumbar paraspinal musculature was nontender to palpation; range of motion was normal in the left lower extremity, but straight leg raise testing was positive on the left; extremity sensation was intact to light touch,

---

[9] Crabtree noted he had one steroid injection at an urgent care facility in June 2020, which helped some, but the pain returned.  (R. at 853.)

except for hypesthesia to the left shin; left upper extremity strength was decreased to 4/5 in the triceps, but grip strength was full, bilaterally; left lower extremity strength was decreased to 2+/5 in the anterior tibialis; and Hoffman's sign[10] was positive in the left upper extremity on reflex testing.  (R. at 854-55.)  Millsaps diagnosed lumbar spondylosis; low back pain; left L5 radiculopathy; left foot drop; hyperreflexia; left triceps weakness; cervical spondylosis; C5-C7 cervical spinal stenosis; and improved cervical radiculopathy, and she ordered a lumbar MRI.  (R. at 855-56.)

This MRI of Crabtree's lumbar spine, dated August 6, 2020, showed a new left foraminal disc extrusion and hypertrophic left facet arthropathy, resulting in moderate to severe left foraminal stenosis and mild narrowing of the left lateral recess at the L4-L5 level; and other degenerative and post-operative changes.  (R. at 542-44.)

Crabtree saw Dr. Kenneth W. Smith, M.D., a neurosurgeon at Blue Ridge Neuroscience Center, on August 10, 2020, reporting worsened left foot weakness since his prior visit, and he relayed an instance where he felt his left hip came out of place. (R. at 857.)  Dr. Smith noted that the MRI revealed a leftward disc extrusion at the L4-L5 level with lateral recess stenosis, which would explain Crabtree's pattern of pain and foot weakness.  (R. at 861.)  He explained that, given Crabtree's two prior surgeries at this same level, albeit on the right side, additional surgical intervention would require a fusion.  (R. at 861.)  Crabtree agreed to proceed with

---

[10] Hoffman's sign or Hoffman's test allows a physician to know whether there are compression problems in the spine near the neck.  The test is based on how the hand's reflexes respond to a quick flick of a fingernail.  *See* https://www.webmd.com/brain/what-to-know-hoffman-test (last visited May 7, 2024).

surgery, and Dr. Smith explained to Crabtree that he likely would not be able to return to work for 12 months.  (R. at 861.)

On September 8, 2020, Dr. Smith performed an L4-L5 decompression and left diskectomy with posterolateral lumbar interbody fusion for a recurrent herniation of a lumbar disc.  (R. at 378-86, 863-71.)  By the following day, Crabtree reported his left lower leg numbness had improved, and he denied any surgical pain.  (R. at 387.) He had full strength throughout, bilaterally, except for 2/5 in the left foot.  (R. at 387.)  Crabtree remained hospitalized until September 13, 2020.  Over this time, he reported continued improved left leg numbness, and he denied any surgical complications.  (R. at 393.)  However, Crabtree developed a urinary tract infection, E. coli and sinus tachycardia, and he was treated with intravenous antibiotics.  (R. at 398, 401-02, 406, 410, 449-50.)  By September 12, 2020, he reported feeling better and denied any lower extremity pain.  (R. at 401.)  Crabtree was discharged the following day in stable condition with restrictions of lifting no more than eight pounds, as well as no twisting, turning, bending, pushing, pulling and tugging.  (R. at 409.)  Crabtree also was instructed to wear a lumbosacral orthosis, ("LSO"), brace[11] at all times when out of bed.  (R. at 409.)

September 20, 2020, lumbar x-rays showed no acute osseous abnormality and the spinal fusion with hardware in the appropriate position.  (R. at 872, 874.)  At a post-operative visit with Millsaps on September 23, 2020, Crabtree reported his pre-operative symptoms were improving, he was having no more "nerve pain," and his foot drop was stable.  (R. at 873.)  He reported difficulty sleeping more than two

---

[11] An LSO brace is a rigid back brace for the mid to lower spine used to limit the motion of the spine.  *See* https://www.goodmancampbell.com/wp-content/uploads/2020/12/LSO.pdf (last visited May 7, 2024).

hours due to discomfort. (R. at 873.) Millsaps said Crabtree was doing well overall, his pre-operative symptoms had improved, but not resolved, and she ordered a lumbar CT scan. (R. at 874.) She changed Crabtree from oxycodone to Lortab and added gabapentin for nerve pain in the left leg, which also might help with sleep. (R. at 874.) An October 14, 2020, lumbar CT scan showed soft tissue/bone graft material extending into the lateral recesses and neural foramina, resulting in foraminal stenosis at the L4-L5 level. (R. at 875.) There also was a large seroma in the posterior subcutaneous tissues. (R. at 875.) When Crabtree returned to Dr. Smith on October 19, 2020, he reported continued numbness and sensitivity in the left heel and inside of the left foot. (R. at 876.) Dr. Smith noted that, overall, he was doing well. (R. at 876.) On examination, Crabtree had 2+/5 strength in the left foot, but strength in both lower extremities was, otherwise, full; his gait was slow and limping, and he was using a cane, but he was able to stand without difficulty; and extremity sensation was intact to light touch, except for hypesthesia to the left shin. (R. at 876.) Dr. Smith diagnosed lumbar spondylosis; low back pain; left L5 radiculopathy, improved; left L4-L5 displacement of lumbar intervertebral disc, operated; degeneration of lumbar intervertebral disc; and left foot drop, stable. (R. at 877.) He advised Crabtree he may wean out of the brace, he refilled his Lortab and Zanaflex, and he noted he would begin physical therapy. (R. at 877.)

Crabtree also saw Dr. Nida on October 19, 2020, for a three-month post-operative visit, at which time his pain was deemed well-controlled, but he had relative loss of sensation in his left foot and left lateral thigh. (R. at 627.) Crabtree reported nighttime discomfort only, limiting his ability to sleep for more than couple of hours nightly. (R. at 627.) On examination, Crabtree had mostly normal findings, including normal neck range of motion; and no generalized musculoskeletal tenderness or edema; but he did exhibit decreased range of motion of the lumbar

back; he was unable to flex or extend the lumbar spine during most of the post-operative period; he had weakness to dorsiflexion of the left foot of 3/5; and he had decreased sensation to soft touch over the left foot and the lateral left thigh.  (R. at 629.)  Dr. Nida diagnosed recurrent herniation of a lumbar disc and status-post lumbar spinal fusion.  (R. at 630.)  He noted Crabtree appeared to be recovering well from his procedure, and he referred him to begin physical therapy in two weeks.  (R. at 630.)

On November 16, 2020, Crabtree endorsed arthralgias, back pain and myalgias, but he reported his pain was much better after surgery.  (R. at 624-25.)  On examination, he had normal neck range of motion; and normal muscle tone.  (R. at 625.)  A detailed musculoskeletal exam was not performed.  (R. at 625.)  That same day, Crabtree attended an initial physical therapy evaluation at Ballad Health Rehabilitation Services, during which it was noted that the most recent lumbar surgery was a "great success to alleviate the low back pain," but Crabtree now had a drop foot affecting his gait.  (R. at 739.)  Crabtree again reported his back pain had improved since surgery, and he had only mild pain after prolonged standing and walking.  (R. at 739.)  On that day, he reported no actual low back pain, but left thigh lateral numbness and left foot numbness in the first three toes.  (R. at 739.)  Crabtree rated his pain as a two on a 10-point scale, and he described it as "intermittent."  (R. at 740.)  He had decreased range of motion, as well as decreased strength, of the left ankle.  (R. at 740.)

Crabtree returned to Millsaps on November 24, 2020, reporting his back was "doing well," and he had noticed getting a little more feeling back in the left big toe. (R. at 744.)  He had weaned out of the brace and had attended two physical therapy sessions.  (R. at 744.)  Crabtree had no new complaints, and he asked to wean off

the Lortab and return to ibuprofen. (R. at 744.) Millsaps noted that, overall, Crabtree was doing well. (R. at 744.) His gait was slow and limping, but he was not using a cane, and he could stand without difficulty. (R. at 744.) Millsaps instructed Crabtree to continue physical therapy and to continue core/back strengthening exercises thereafter. (R. at 745.) She released him from Dr. Smith's care, to return on an as-needed basis. (R. at 745.) Lumbar spine x-rays from that day, showed no significant change from the October 14, 2020, CT scan. (R. at 743.)

Crabtree continued physical therapy from December 1 through December 22, 2020. (R. at 747-58.) Over this time, he rated his pain as a one to two on a 10-point scale, which he described as minimal. (R. at 752-57.) On December 1, 2020, all exercises but one were painless and comfortable for Crabtree. (R. at 758.) On December 3, 2020, it was noted that Crabtree's low back was doing great with minimal complaints of pain or discomfort during treatments, and he had improving flexion during range of motion exercises. (R. at 756.) On December 8, 2020, Crabtree complained of intermittently sharp pain during certain active range of motion exercises, but by December 17, such complaints were lessened. (R. at 752, 754.) On December 17, he also continued to have little motion of left dorsiflexion and experienced drop foot, but he reported compliance with home exercises. (R. at 752.) On January 13, 2021, Crabtree asked to be discharged from physical therapy, as his health insurance coverage ended. (R. at 765.) In a discharge summary, it was noted that Crabtree responded well to physical therapy with positive improvement, and he was instructed in home exercises. (R. at 765.)

On February 8, 2021, Dr. Jack Hutcheson, M.D., a state agency physician, completed a physical assessment of Crabtree, finding he could perform light work, except he could use the left foot occasionally for the operation of foot controls; he

could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; never climb ladders, ropes and scaffolds; and he should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 66-67.)  Dr. Hutcheson based these limitations on Crabtree's degenerative disc disease of the lumbar spine; his three lumbar surgeries with residual left foot drop; and his body mass index of 30.  (R. at 66-67.)  He noted that Crabtree reported improvement in his back pain after surgery, that he showed overall improvement with physical therapy and was not using an assistive device, among other things. (R. at 67.)

Crabtree returned to Dr. Nida on March 1, 2021, reporting his left leg numbness and left foot drop were the same as before his back surgery.  (R. at 784.) He stated he was willing to return to physical therapy because it improved his core strength and helped his back pain.  (R. at 784.)  Crabtree stated he had difficulty finding a comfortable sleeping position.  (R. at 784.)  He endorsed arthralgias, back pain and myalgias; weakness and numbness; and sleep disturbance.  (R. at 786.)  A physical examination was normal, including normal neck range of motion; normal musculoskeletal range of motion; no musculoskeletal tenderness, deformity or edema; and normal muscle tone.  (R. at 786-87.)  Dr. Nida referred Crabtree for another course of physical therapy.  (R. at 787.)

Crabtree returned to physical therapy from March 17 to April 15, 2021.  On March 17, 2021, it was noted the prior course of physical therapy resulted in "great improvements."  (R. at 832, 834.)  Crabtree reported more of a tiring and aching low back, with a pain rating of six out of 10, aggravated by prolonged activity or prolonged walking and eased by ibuprofen and rest.  (R. at 834.)  He described the pain as intermittent.  (R. at 834.)  On testing, Crabtree had decreased lumbar range

of motion and left ankle range of motion; he had increased tightness and pain to the bilateral lumbar paraspinals; numbness and lack of sensation to the left lateral thigh and the first three toes; left drop foot; and right toe numbness. (R. at 834-35.) Over the course of his physical therapy treatment, he rated his pre-physical therapy pain as a four to five out of 10 and his post-physical therapy pain as a four out of 10. (R. at 819, 823, 826, 829, 841.) On March 23, 2021, he had significant left dorsiflexion weakness and piriformis tightness. (R. at 830.) On March 25, 2021, Crabtree reported his pain was "really bad" that morning, and he felt like he was dragging his foot through the house. (R. at 826.) His ankle flexibility was very limited in all planes. (R. at 827.) On March 30, 2021, Crabtree had 2+ pitting edema of both ankles and feet, which began over the past few weeks, which had decreased to 1+ by April 6 and even more by April 15, 2021. (R. at 820, 824, 842.) Also on April 15, Crabtree saw Dr. Nida, requesting more ibuprofen for pain control. (R. at 811.) On examination, he had no musculoskeletal tenderness or edema, as well as normal neck range of motion, reflexes, muscle tone and coordination. (R. at 814.) Dr. Nida prescribed 800 mg ibuprofen and referred Crabtree for a functional capacity evaluation. (R. at 814.) On April 22, 2021, Crabtree called to cancel his physical therapy appointment, stating he wished to be discharged because he had "too much going on." (R. at 847.) In a Discharge Summary, it was noted Crabtree did not complete the full course of therapy, and he did not respond well, with minimal functional improvements. (R. at 845.) He was instructed in home exercises and encouraged to follow up with his physician. (R. at 845.)

On April 1, 2021, Dr. Bert Spetzler, M.D., a state agency physician, completed another physical assessment of Crabtree, finding he could lift/carry up to 20 pounds occasionally and up to 10 pounds frequently; push/pull with the upper extremities up to the lift/carry restrictions; occasionally use the left foot for the operation of foot

controls; stand and/or walk for a total of four hours and sit for a total of about six hours in an eight-hour workday; and avoid concentrated exposure to vibration and hazards, such as machinery and heights.  (R. at 76-77.)  Dr. Spetzler based these limitations on Crabtree's degenerative disc disease of the cervical and lumbar spine; three lumbar surgeries with residual left foot drop, pain and numbness; and a BMI of 30.  (R. at 76-77.)  Dr. Spetzler noted that new evidence received did not validate the initial administrative findings of Dr. Hutcheson, including evidence of ongoing lower extremity pain, numbness, tightness, weakness and left foot drop, although Crabtree did have some improvements with ongoing physical therapy and home exercises. (R. at 77.)  He opined that it was reasonable to expect at least a sedentary residual functional capacity at one year from the last fusion operation, and there was potential for considerable improvement beyond that.  (R. at 77.)

On June 10, 2021, Crabtree reported to Dr. Nida he had throbbing and aching at the fusion site, right above the fusion site and in his hips.  (R. at 878.)  He stated physical therapy provided some relief, and 800 mg ibuprofen usually helped, but he sometimes had to "double up."  (R. at 878.)  Crabtree also reported some leg cramping. (R. at 878.) He had high blood pressure, but, otherwise, a normal physical examination.  (R. at 881.)  Crabtree declined a referral to physical medicine rehabilitation for his chronic back pain.  (R. at 884.)  When he returned to Dr. Nida on October 11, 2021, he complained of back and hip pain, but he was mainly there to get a referral to physical therapy for a functional capacity evaluation, as requested by his lawyer.  (R. at 886.)  Crabtree reported taking ibuprofen for pain control.  (R. at 886.)  On examination, he had significant limitation of range of motion of the lower lumbar spine; tenderness over the sacroiliac joints, bilaterally; tenderness over the paraspinal muscles, especially on the right in the lumbar and sacral regions; some reproducible pain in the groin on both hips, reproducible on active movement, most

pronounced on adduction and flexion of the hip; but no tenderness over the trochanteric bursa on either side; and normal strength and sensation in both lower extremities. (R. at 888.)  Otherwise, exam findings were normal. (R. at 888.)  Dr. Nida referred Crabtree for a functional capacity evaluation. (R. at 889.)

On December 9, 2021, Crabtree saw Dr. Kyle Addison Ward, D.O., at Ballad Health Medical Associates, for a six-month follow up. (R. at 902.)  Examination findings were normal, including normal musculoskeletal range of motion; and no focal deficits. (R. at 905.)  Dr. Ward continued Crabtree's medication regimen and advised him to return in three months. (R. at 906.)

On January 8, 2022, Vickie Stevens, F.N.P., B.C., a board-certified family nurse practitioner with Southern Medical Group, Inc., completed a consultative evaluation of Crabtree at the request of Disability Determination Services. (R. at 891-95.)  Crabtree reported he could perform personal care, but his sons did the vast majority of everything around the house. (R. at 891.)  He said he was independent with his activities of daily living, but he left the house only for appointments and to go to the grocery store, where he walked with a grocery cart to support his weight. (R. at 891.)  Crabtree reported he sat around his house, and he was in pain "24/7" since the age of 14, but he was able to tolerate the pain until recently. (R. at 891.)  Crabtree reported taking ibuprofen for pain, and he said he had severe leg and left foot cramps three to four times nightly. (R. at 891.)  He endorsed fatigue, night sweats, nose bleeds, claudication and low back pain, weakness and sensory loss, among other things. (R. at 891-92.)  On examination, Crabtree could ambulate without assistance; he had no muscle asymmetry, atrophy or involuntary movements; there was no structural deformity, effusion, periarticular swelling, erythema, heat, swelling or tenderness of any joint, except as specifically mentioned

in the report; gait and station were normal, and he could rise from a sitting position with assistance, but he was unable to stand on tiptoes, walk on heels and tandem walk; he was unable to bend and squat; he had full grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; there was no edema, cyanosis or erythema of the extremities; he had strong neck movement against resistance and good shoulder shrug; he had good muscle tone and full muscle strength, bilaterally, in all muscle groups; Romberg was negative; finger to nose, heel to shin and rapid alternating movements were intact and without fatigue; there were no abnormal reflexes; and sensation to light touch, pain, position and vibration were intact throughout. (R. at 892-93.) Stevens diagnosed low back pain, among other things, and she opined Crabtree could not sit, walk and/or stand for a full workday or lift/carry objects without limitations. (R. at 893.)

Stevens also completed a physical assessment of Crabtree, finding he could carry up to 10 pounds occasionally; sit for five minutes without interruption, but for 15 minutes in an eight-hour workday; stand for 10 minutes without interruption and for 10 minutes in an eight-hour workday, but he had to shift his weight; and walk for 10 minutes without interruption and for 10 minutes in an eight-hour workday. (R. at 896-901.) She found he did not require a cane to walk, nor was one medically necessary, and he could walk 75 to 100 feet without a cane before holding onto or leaning onto something. (R. at 897.) Stevens found that, without a cane, Crabtree could use his free hand to carry small objects. (R. at 897.) She found he could occasionally reach in all directions, handle, finger, push and pull with the dominant right hand occasionally and feel frequently. (R. at 898.) Stevens found Crabtree could use the right foot occasionally for the operation of foot controls, noting he drove only when absolutely necessary. (R. at 898.) She found he could never climb ladders or scaffolds, stoop, kneel, crouch or crawl, but could occasionally climb

stairs and ramps and balance.  (R. at 899.)  Stevens found Crabtree was not able to
avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar or
approaching people or vehicles.  (R. at 899.)  She found he could never be exposed
to unprotected heights, moving mechanical parts, vibrations and door jams;[12] he
could have occasional exposure to operating a motor vehicle, humidity and wetness
and extreme heat; and he could have frequent exposure to dust, odors, fumes and
pulmonary irritants, extreme cold and loud noise.  (R. at 900.)  Stevens found
Crabtree could shop; ambulate without using an assistive device; use standard public
transportation; prepare a simple meal and feed himself; care for his personal hygiene;
and sort, handle and use paper/files.  (R. at 901.)  She found he could not travel
without a companion for assistance; walk a block at a reasonable pace on rough or
uneven surfaces; and climb a few steps at a reasonable pace with the use of a single
handrail.  (R. at 901.)

On March 23, 2022, Crabtree saw Dr. Michael Jon Lilly, M.D., at Ballad
Health Medical Associates, for a three-month follow up.  (R. at 907.)  Crabtree
reported a long history of back pain, now worsened, and not controlled by ibuprofen.
(R. at 907.)  Dr. Lilly noted Crabtree was averse to any kind of narcotics, and
gabapentin caused adverse side effects, but he was amenable to starting Celebrex
and seeing physical medicine and rehabilitation.  (R. at 908.)  Crabtree's chief
complaint was chronic back pain with neurologic symptoms, including left lateral
leg numbness with left foot numbness, as well as the recent beginning of less severe
right lateral leg numbness and right hallux numbness, which had caused him to injure
his feet, including getting a piece of glass stuck in it and having a splinter in his foot
without realizing it.  (R. at 908.)  On examination, Crabtree had normal

---

[12] Stevens noted that Crabtree had a left foot drop, resulting in difficulty moving quickly
and avoiding door jams, as well as his foot catching and causing him to trip.  (R. at 900.)

musculoskeletal range of motion; normal cervical range of motion; left lateral leg and foot numbness, as well as beginning right lateral leg numbness and hallux numbness; and left foot drop.  (R. at 912.)  Dr. Lilly prescribed Cymbalta and Celebrex for back pain, and he referred Crabtree to physical medicine and rehabilitation for chronic pain management.  (R. at 913.)

A January 18, 2023, MRI of the cervical spine showed degenerative changes at the C6-C7 level leading to moderate spinal canal stenosis and severe bilateral neural foraminal stenosis; moderate spinal canal stenosis and high-grade bilateral neural foraminal stenosis at the C4-C5 and C5-C6 levels; and multi-level degenerative changes.  (R. at 38.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Crabtree argues the Appeals Council erred by finding he had transferable skills. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.)   He also argues the ALJ erred by improperly determining his residual functional capacity, in that she improperly rejected the opinion of consultative examiner Stevens. (Plaintiff's Brief at 5-6.)

If the ALJ determines that a claimant cannot return to his past relevant work, as the ALJ did here, the analysis proceeds to the fifth and final step of the sequential evaluation process.   Under that step, the Commissioner bears the burden of demonstrating that the claimant can perform other jobs existing in significant

numbers in the national economy.  *See Pearson v. Colvin*, 810 F.3d 204, 211 (4th Cir. 2015); 20 C.F.R. §§ 404.1512(b)(3), 404.1520(g) (2023).  In determining whether a claimant can perform other work, the ALJ considers whether the claimant acquired transferable work skills from past relevant skilled or semi-skilled work.  *See* 20 C.F.R. §§ 404.1565, 404.1568(d) (2023); *see also Inabinet v. Kijakazi*, 2021 WL 4875857, at *3 (D. S.C. July 23, 2021), *adopted*, 2021 WL 4868671 (D. S.C. Oct. 19, 2021).  A claimant has "skills that can be used in other jobs, when the skilled or semi-skilled work activities [the claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."  20 C.F.R. § 404.1568(d)(1); *see also* Social Security Ruling, ("S.S.R."), 82-41, 1982 WL 31389, at *2 (Jan. 1, 1982) ("Transferability means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs.").  Transferable skills include those that: (1) require the same or a lesser degree of skills; (2) involve the same or similar tools and machines; or (3) use the same or similar raw materials, products, processes or services.  *See* 20 C.F.R. § 404.1568(d)(2).  "A complete similarity of all three factors is not necessary for transferability."  20 C.F.R. § 404.1568(d)(3).  S.S.R. 82-41 defines a "skill" as "knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties. …"  S.S.R. 82-41, 1982 WL 31389, at *2.  Skills are the "practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner.  This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery."  S.S.R. 82-41, 1982 WL 31389, at *2.  A person cannot acquire skills by doing unskilled work.  *See* S.S.R. 82-41, 1982 WL 31389, at *2; 20 C.F.R. § 404.1568(a) (2023).

"Skills, levels of skills and potential occupations to which skills from [past relevant work] may be transferred are for the … ALJ to determine (with the assistance, when required, of a [VE] or occupational reference sources)." S.S.R. 82-41, 1982 WL 31389, at *4. *See also Hall v. Harris*, 658 F.2d 260, 267 (4th Cir. 1981) (stating that the ALJ "may, and ordinarily should, require the testimony of a vocational expert" in making the transferability determination). If an ALJ finds transferable skills, "the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the … ALJ's decision." S.S.R. 82-41, 1982 WL 31389, at *7. In the transferability analysis, "an ALJ must (1) identify the acquired work skills: (2) identify specific occupations to which the acquired work skills can be transferred; and (3) include evidence that jobs are sufficiently prevalent in the economy." *Rosalyn G. v. Kijakazi*, 2022 WL 1311473, at *8 (E.D. Va. Apr. 15, 2022) (citing S.S.R. 82-41, 1982 WL 31389, at *7).

Here, Crabtree testified he worked as a police officer over the prior 23 years, with various assignments. (R. at 925.) He said he began as a patrol officer, which was very demanding in physical exertion at times. (R. at 925.) Crabtree stated that the last seven years he worked as a school resource officer, which was a little bit less physically demanding. (R. at 925-26.) He said he was responsible for the school children, and, on rare occasion, he would have to physically restrain someone. (R. at 926.) Crabtree testified that he walked the hallways and the perimeter of the school, and he had an office in which he observed cameras throughout the day. (R. at 926.) In a December 7, 2020, Work History Report, Crabtree indicated he worked as a deputy sheriff from August 2000 to July 12, 2020, with the following job duties: "Police officer various activities daily. Running, carrying, crawling, report writing, lifting heavy objects, climbing, driving, sitting." (R. at 276-77.) He also checked

boxes indicating he used machines, tools or equipment; he used technical knowledge or skills; and he did writing, completed reports or performed duties like this. (R. at 277.) Crabtree specified he spent four hours daily writing, typing or handling small objects, and he stated he supervised five people for eight to 10 hours daily. (R. at 277.)

At the hearing, the vocational expert classified Crabtree's past relevant work as a patrol officer and as a police officer II. (R. at 937.) When asked whether "the claimant [would] have learned any skills that would transfer to the sedentary level[,]" she stated, "Yes, Your Honor, there would be skills that would transfer." (R. at 937.) Specifically, she testified that these transferable skills "include[d] communication skills, recording and reporting, and basic computer and keyboard skills." (R. at 937.) The ALJ then posed a hypothetical to the vocational expert, containing Crabtree's age, education and past work experience and the residual functional capacity ultimately found by the ALJ. (R. at 937-38.) She testified such an individual could not perform any of Crabtree's past relevant work, but could perform other work in the national economy with Crabtree's transferable skills, including the sedentary jobs of an information clerk, a dispatcher and a service dispatcher/service clerk. (R. at 938-39.) The vocational expert stated that her testimony was consistent with the D.O.T., except the D.O.T. does not address alternating sitting and standing, which she based on her experience. (R. at 939.) As noted above, the ALJ, in her decision, found that Crabtree did not have transferable skills, but then proceeded to find at step five that he could perform the semi-skilled jobs of an information clerk, a dispatcher and a service dispatcher. (R. at 229.) The Appeals Council, thereafter, corrected such inconsistent findings, concluding they were the product of a typographical error in the decision. (R. at 229.)

First, Crabtree argues the Appeals Council erred by finding he had transferable skills, in that it relied on the vocational expert's testimony, which was "completely erroneous and without fact or truth." (Plaintiff's Brief at 5.) Specifically, Crabtree argues the vocational expert's testimony that he, in his long career as a deputy sheriff, had transferable skills of "recording and keyboarding" is erroneous,[13] as no such evidence was introduced, and the D.O.T. does not provide that recording or keyboarding skills are essential to the performance of a job as a deputy sheriff. (Plaintiff's Brief at 5.) Moreover, Crabtree argues that there is no evidence that there are skills requisite to a deputy sheriff's duties that would qualify such an individual to be an information clerk, a dispatcher or a service dispatcher, all of which jobs, he argues, would require skilled or semi-skilled clerical abilities, "totally unlike the skills necessary to perform [d]eputy [s]heriff's duties." (Plaintiff's Brief at 5.) Thus, Crabtree argues, the ALJ's and Appeals Council's finding that he could perform the sedentary, semi-skilled jobs of information clerk, dispatcher and service dispatcher is not based on substantial evidence because it was based on erroneous vocational expert testimony. (Plaintiff's Brief at 5.) For the following reasons, I am not persuaded by Crabtree's arguments.

Here, the vocational expert identified Crabtree's past relevant work as a patrol officer, found at 1 D.O.T. 379.263-014, and as a police officer II, found at 1 D.O.T. 375.367-010. (R. at 937.) The title of the patrol officer occupation in the D.O.T. is "Public-Safety Officer[,]" and it states, among other things, that such an individual "[p]atrols [an] assigned beat and responds to emergency calls to protect persons or property from crimes, fires, or other hazards[.]" 1 DICTIONARY OF OCCUPATIONAL

---

[13] He concedes that, as a police officer, he had to have the ability to communicate, but there were no specialized communication skills that would specifically transfer to any sedentary work activity. (Plaintiff's Brief at 5.)

TITLES, ("D.O.T."), public-safety officer, occupational code 379.263-014 (4th ed. rev. 1991). Duties listed include regulating traffic, controlling crowds, preventing crime, arresting violators, responding to crimes in progress, initiating actions such as aid to victims and interrogation of suspects, attending public gatherings to maintain order, responding to fire alarms or other emergency calls, forcing openings in buildings for ventilation of fire or for entry, controlling and extinguishing fires, administering first aid and artificial respiration to injured persons and participating in drills and emergency precautionary demonstrations. *See* 1 D.O.T. 379.263-014. The police officer II listing states that, among other things, such an individual guards juveniles detained at police station houses or detention rooms pending hearing, return to parents or transfer to penal institution and is responsible for inmates' care while incarcerated. *See* 1 D.O.T., police officer II, occupational code 375.367-010 (4th ed. rev. 1991). Duties listed include investigating, making recommendations concerning the disposition of a case, caring for sick or intoxicated juvenile prisoners, caring for lost and runaway children until parents or guardians are contacted and accompanying juvenile prisoners to court and remaining there until the case has been disposed of. *See* 1 D.O.T. 375.367-010.

Thus, neither the D.O.T. listing for Crabtree's past relevant work as a patrol officer nor the listing for his past relevant work as a police officer II describes duties of either recording or keyboarding. It is true, however, that, in a December 2020 Work History Report, Crabtree included "report writing" as one of the activities of his job as a deputy sheriff/police officer. (R. at 276-77.) He also answered in the affirmative to the question, "In this job, did you [d]o any writing, complete reports, or perform duties like this?" (R. at 277.) Lastly, Crabtree also stated he spent four hours each day "writ[ing], typ[ing], or handl[ing] small objects." (R. at 277.) S.S.R. 82-41 states as follows, "In evaluating the skill level of [past relevant work] …, work

activities are the determining factors." 1982 WL 31389, at *3. To that end, "[t]he *claimant* is in the best position to describe just what he or she did in [past relevant work], how it was done, what exertion was involved, what skilled or semiskilled work activities were involved, etc. Neither an occupational title by itself nor a skeleton description is sufficient." S.S.R. 82-41, 1982 WL 31389, at *4 (emphasis added). Thus, although the ALJ may utilize occupational reference sources like the D.O.T. in determining the claimant's acquired work skills, she is not required to do so. *See* S.S.R. 82-41, 1982 WL 31389, at *4.

I find that the activity of "report writing" contained in Crabtree's Work History Report is sufficiently akin to the transferable skill of "recording" as found by the Appeals Council. Similarly, Crabtree affirmatively indicated he did "writing, complete[d] forms, or performed duties like this." (R. at 277.) He further reported he spent four hours each workday "writ[ing], typ[ing], or handl[ing] small objects." (R. at 277.) Although Crabtree did not specify whether he did only one of these activities, all of them or some combination thereof, given his specific handwritten statement that he wrote reports, I find that he could have been indicating that the four hours spent daily was on "writing." Therefore, I find that substantial evidence supports the Appeals Council's finding that Crabtree had the transferable skill of "recording," but not necessarily typing or "keyboarding," as neither the D.O.T. nor Crabtree's testimony support such a finding. I also find that substantial evidence supports the Appeals Council's finding that he had the ability to communicate, as Crabtree's past relevant work, according to the D.O.T. listings, included investigating and interrogating duties, which, undoubtedly require communication skills. Additionally, Crabtree, in his brief, concedes that his job as a deputy sheriff required an ability to communicate, and on the December 2020 Work History Report, he also stated he supervised five individuals for eight to 10 hours daily. (R.

at 277.)  I find that such supervisory responsibility necessarily would require communication skills.

Next, Crabtree argues that there is no evidence that there are skills requisite to a deputy sheriff's duties that would qualify an individual to perform the jobs identified by the vocational expert as jobs existing in significant numbers in the national economy he could perform, as all of those jobs would require skilled or semi-skilled clerical abilities "totally unlike the skills necessary to perform [d]eputy [s]heriff's duties."  (Plaintiff's Brief at 5.)  For the reasons that follow, I am not persuaded.

The job of Information Clerk, found at 1 D.O.T. 237.367-022, is described as answering inquiries from persons entering an establishment.  Duties listed include providing information regarding activities conducted at the establishment and locations of departments, offices and employees within the organization; informing customers of location of store merchandise in a retail establishment; providing information concerning services, such as laundry and valet services, in hotel; and receiving and answering requests for information from company officials and employees.  *See* 1 D.O.T., information clerk, occupational code 237.367.022 (4th ed. rev. 1991).  This listing states that the individual may keep a record of questions asked.  *See* 1 D.O.T. 237.367.022.  The job of Dispatcher, Radio, found at D.O.T. 379.362.010, is described as receiving complaints from the public concerning crimes and police emergencies, broadcasting orders to police radio patrol units in the vicinity to investigate complaints and relaying instructions or questions from remote units.  Duties listed include recording calls broadcast and complaints received; and, in some municipalities, coordinating all police, fire, ambulance and other emergency requests and relaying instructions to the radio unit concerned.  *See* 1 D.O.T.,

dispatcher, radio, occupational code 379.362-010 (4th ed. rev. 1991).  The job of a Service Clerk, found at 1 D.O.T. 221.367-070, is described as receiving, recording and distributing work orders to service crews upon customers' requests for service on articles or utilities purchased from wholesale or retail establishments or utility companies.  Duties listed include recording information, such as name, address, article to be repaired or service to be rendered; preparing work orders and distributing to a service crew; scheduling service calls and dispatching a service crew; calling or writing customers to ensure satisfactory performance of service; and keeping a record of service calls and work orders.  *See* 1 D.O.T., service clerk, occupational code 221.367-070 (4th ed. rev. 1991).

I find that the duties listed for these jobs entail, essentially, communication and recording skills, the transferable skills from Crabtree's past relevant work that are supported by substantial evidence.  For example, the Information Clerk job informs customers of the location of store merchandise and receives and answers requests from company officials and employees.  These are clearly communication skills.  The Dispatcher job *records* complaints from the public about crimes and relays instructions to the appropriate responding unit.  These are both recording and communication skills.  Finally, the Service Clerk job *records* information, prepares work orders and distributes them to a service crew and calls or writes customers. Again, these are both recording and communication skills.

For the above-stated reasons, I find that the Appeals Council analyzed Crabtree's transferability of skills under the appropriate rule and regulation, substantial evidence supports the findings that he had acquired the skills of communication and recording and that substantial evidence supports the vocational

expert's testimony that these skills would transfer to the jobs of an information clerk, a dispatcher and a service dispatcher.

Crabtree also argues the ALJ erred by improperly rejecting the opinion of consultative examiner Stevens, in making her residual functional capacity determination.  For the reasons that follow, I disagree.

For DIB cases on or after March 27, 2017, the ALJ evaluates medical opinions in accordance with 20 C.F.R. § 404.1520c.[14]  Consideration of medical opinions is expressed in terms of how persuasive they are.  *See* 20 C.F.R. § 404.1520c(b) (2023).  Medical opinions are evaluated for supportability, consistency, relationship with the claimant (including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship and examining relationship), specialization and other factors that tend to support or contradict a medical opinion.  The most important factors are supportability[15] and consistency.[16]  *See* 20 C.F.R. § 404.1520c(b), (c) (2023).  The ALJ does not defer or give any specific evidentiary weight to any medical opinion, including those from a claimant's medical source.  *See* 20 C.F.R. § 404.1520c(a) (2023).  Although the amended regulations no longer discuss the "weight" given to medical opinions, the

---

[14] *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

[15] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1).

[16] "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim."  Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

ALJ's reason for finding an opinion persuasive or unpersuasive still must be supported by substantial evidence.

The ALJ found Crabtree had the residual functional capacity to perform sedentary work, except he should never climb ladders, ropes or scaffolds, never crouch and never perform fine balancing; he could occasionally stoop, kneel, crawl and climb ramps and stairs; he could not use foot pedals with the left lower extremity; and he could have no exposure to industrial vibration, hazards or unprotected heights. (R. at 17-18.)

In her decision, the ALJ correctly stated that Stevens opined Crabtree could occasionally lift up to 10 pounds, sit for a total of 15 minutes, stand for a total of 10 minutes and walk for a total of 10 minutes in an eight-hour workday. (R. at 23, 896-97.) Stevens further opined Crabtree did not need a cane and could walk for 75 to 100 feet before needing to hold on or lean into something. (R. at 23, 897.) Stevens opined Crabtree could occasionally reach, handle, finger and push/pull and frequently feel with the right hand. (R. at 23, 898.) She opined he could occasionally use the right foot to operate foot controls, and he could occasionally climb ramps and stairs and balance, but he should never perform any other postural activities. (R. at 23, 898-99.) The ALJ found Stevens's opinion unpersuasive, as it was inconsistent with the evidence showing Crabtree had full range of motion and normal grip strength in the right arm and hand. (R. at 23, 892-94.) In particular, in Stevens's physical examination findings, she indicated 5/5 grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally. (R. at 892.) Stevens also indicated normal range of motion in the elbows, shoulders and wrists. (R. at 893-94.) The ALJ also found Stevens's opinion that Crabtree had limited use of the *right* foot was inconsistent with the totality of the evidence demonstrating *left*

foot drop, as well as with her own examination findings.  (R. at 23, 784, 893.)
Specifically, the ALJ noted the treatment notes from March 1, 2021, from Dr. Nida,
during which Crabtree continued to complain of left leg numbness and foot drop on
the left.  (R. at 784.)  Moreover, Stevens's examination showed reduced range of
motion of the *left* ankle.  (R. at 893.)  Furthermore, the ALJ found that Stevens's
severe limitations appeared to be based on Crabtree's subjective statements, as
opposed to her examination findings.  (R. at 23.)  In particular, the ALJ noted that
Stevens's findings regarding Crabtree's abilities to sit, stand and walk were not
supported by her own examination, which showed only reduced range of motion of
the spine and left foot, as well as lack of left foot strength.  (R. at 23, 892-93.)
Otherwise, Stevens's examination showed Crabtree ambulated without assistance;
he had no muscle asymmetry or atrophy; he had a normal gait and station, and could
rise from a sitting position with assistance; he had no extremity edema, cyanosis or
erythema; he had good muscle tone and full strength in all muscle groups, bilaterally;
he had no abnormal reflexes; and sensation was intact throughout to light touch,
pain, position and vibration.  (R. at 892-93.)

For all these reasons, I find that substantial evidence supports the ALJ's
evaluation of Stevens's opinion, as well as her ultimate residual functional capacity
determination that Crabtree could perform a reduced range of sedentary work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now
submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the
   Appeals Council's finding that Crabtree had transferable

    skills;

2. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence of the consultative examiner;

3. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Crabtree was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Crabtree's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

    Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time at this time.

DATED:    July 18, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE